UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
HAMPTONS LOCATIONS, INC. and NANCY
GRIGOR,

               Plaintiffs,                    **MEMORANDUM OF DECISION
AND ORDER**

   -against-                             01-CV-5477 (DRH)(WDW)

RICHARD RUBENS, BARBARA RUBENS, and
DARRELL RUBENS, each individually and
doing business as HAMPTON LOCATIONS,

               Defendants.
---------------------------------------------------------------X
**APPEARANCES:**

**PATRICIA WEISS, ESQ.**
Attorney for Plaintiffs
P.O. Box 751
Sag Harbor Shopping Cove
Main Street - Suite 12
Sag Harbor, New York 11963-0019

**MICHAEL B. RONEMUS, ESQ.**
Ronemus & Vilensky
Attorney for Defendants
112 Madison Avenue
New York, New York 10016

**HURLEY, District Judge**:

        Plaintiffs Hamptons Locations, Inc. and Nancy Grigor ("Grigor") (collectively,

"Plaintiffs") filed the present action against defendants Richard Rubens ("Richard"), Barbara

Rubens ("Barbara"), and Darrell Rubens ("Darrell") (collectively, "Defendants") claiming

damages arising out of Defendants' use of an allegedly infringing website.  Defendants have

moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons

that follow, Defendants' motion is granted in part and denied in part.

*BACKGROUND*

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are undisputed unless otherwise noted. Grigor is the owner, President, and sole employee of plaintiff Hamptons Locations, Inc., a New York corporation. Since 1994, Hamptons Locations, Inc. has used the service mark and business name "Hamptons Locations" and the domain name "www.hamptonslocations.com."

Hamptons Locations provides and scouts locations for photo shoots, film and television commercials, videos, and corporate meetings. Essentially, Hamptons Locations is a "location finder." (Dep. of Nancy Grigor, dated July 23, 2004 ("Grigor Dep."), at 4.) After two failed attempts at registration, the United States Patent and Trademark Office finally accepted Plaintiffs' mark for registration on August 20, 2002. Hamptons Locations was granted service mark protection for "SCOUTING FOR LOCATIONS FOR TELEVISION COMMERCIALS, CATALOGUES, AND CORPORATE MEETINGS; PRODUCTION OF TELEVISION COMMERCIALS, IN CLASS 35"; and for "ENTERTAINMENT BASED LOCATION SCOUTING, NAMELY, SCOUTING FOR LOCATIONS FOR PHOTOSHOOTS, MOTION PICTURE FILMS, MAGAZINES, PARTIES, AND VIDEOS; MOTION PICTURE FILM PRODUCTION; VIDEO PRODUCTION, IN CLASS 41." (Defs.' Mot. For Summary Judgment, Ex. Q.) The certificate of registration further states "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'LOCATIONS', APART FROM THE MARK AS SHOWN." (*Id.*)

Barbara and Richard are husband and wife. Darrell is their son. Barbara and Richard work for Design Quest, Ltd., an architectural and interior design firm located in New

York City.  They own a home in the Hamptons which they designed and built in 1983 and use their home as an example of their architectural talents.  With the help of their son Darrell, they developed a website – www.dqny.com – to showcase their services.  This website displays pictures of their Hamptons home and offers the home as a rental for photo shoots.

At this point, the parties' submission are replete with factual disputes.  According to Grigor, in the winter of 1998-99, she left her business card at the Rubens' Hamptons home, requesting that she be contacted about adding their home to her inventory of houses.  (Aff. of Nancy Grigor, dated Feb. 9, 2005 ("Grigor Aff.") ¶ 13.)  She allegedly followed up in the "Spring of 1999" by leaving a second business card taped to the door.  (*Id.*)  Grigor further claims that "[i]n or around July 1999," she met with Richard and Barbara and that the Rubens "acknowledged receipt of Plaintiffs' business cards left at the house and they said that they had heard of Plaintiffs' business."  (*Id.* ¶ 14.)  "To the best of [her] recollection," this meeting was "sometime over July 4th weekend," (*id.*), or might have "actually occurred a few days later."  (*Id.* ¶ 15.)  That same day, she photographed their Hamptons home with hopes of marketing it for future photo shoots.  (*Id.* ¶ 14.)  Defendants deny meeting Grigor at this time and also deny receipt of Plaintiffs' business cards.

Plaintiffs claim that "despite Defendants' awareness of Plaintiffs' mark through business cards left at the house, Defendants caused the registration of the domain name 'HamptonLocations.com,' on or about July 8, 1999."  (*Id.* at ¶ 15.)  The only difference between the domain name and Plaintiffs' business name, i.e., Hamptons Locations, was the absence of the letter "s" between the words "Hampton" and "Location."

According to Defendants, Darrell, together with his friends and without his

parents' knowledge, "decided to explore offering Hamptons summer rentals on the internet, at

discount fees." (Aff. of Richard Rubens, dated Jan. 5, 2005, ¶ 10.) Darrell and his friends used a

company called Network Services to see what domain names were available. (Aff. of Darrell

Rubens, dated Jan. 5, 2005 ("Darrell Aff."), ¶ 7.) They "decided that the domain name that best

suited [their] venture was www.hamptonlocations.com and one of [Darrell's] friends purchased

this name through DSNY at Network Solutions" on July 8, 1999. (*Id.* ¶ 8.) This domain name

remained dormant until April 2000 while Darrel and his friends researched the proposed real

estate business. Eventually, they decided not to pursue this venture.

On April 18, 2000, Darrell decided that the domain name was a good way to

describe his parents' Hamptons home and allegedly "took it upon himself" to use the domain

name in connection with their house. Because he often helped his parents update their Design

Quest website and because he knew his parents' home was displayed on that site, he "linked" the

www.hamptonlocations.com website with his parents' Design Quest Website, www.dqny.com.

In other words, if a person typed in www.hamptonlocations.com, a "link" would re-route that

person to the Design Quest website. He allegedly created this link without telling his parents.

Thereafter, on April 18, 2000, Darrell alleges that he researched location scouting

companies on the internet. He sent e-mails to some of these companies, including one to

Plaintiffs, offering his parents' home for location shoots. (*Id.* ¶ 11.) These e-mails directed the

location companies, through the link of www.hamptonlocations.com, to the website of Design

Quest. His e-mail to Plaintiffs stated as follows: "we rent our house out for photo, film and

commercial shoots. How can we list with you? Please look at our house at

www.hamptonlocations.com." Darrell claims that he had never heard of Plaintiffs prior to

sending this e-mail.  (*Id.* ¶ 12.)

Grigor admits that she opened Darrell's email that day but claims that she merely glanced at it before putting it aside in a pile of other messages.  She claims she did not realize at that time that Darrell's e-mail referred to the allegedly infringing website.  (Grigor Aff. ¶ 47.)

On June 13, 2000, Grigor conducted a photo shoot at the Rubens' house.  (Grigor Dep. at 37.)  She alleges that she arranged for this shoot based on the information she had already assembled about Richard and Barbara in July 1999.  (*Id.*)  Defendants maintain, however, that she arranged the photo shoot in response to Darrell's e-mail.

Barbara and Richard contend that they first became aware of the alleged dispute over the domain name when they pursued Plaintiffs for overtime charges of $937.50, allegedly due them as a result of the June 13, 2000 photo shoot, which led to a heated dispute between the parties.  On June 25, 2000, Plaintiff's then counsel wrote a letter to Darrel demanding that he "cease and desist from the use of the domain name www.HamptonLocations.com" and that he "arrange for the transfer of its ownership to" Plaintiffs.  By letter dated June 27, 2000, Darrell responded, inter alia, that he was not the owner of the domain name and that the domain name did not infringe upon Plaintiffs' mark as it merely contained a portfolio of the Hamptons house and did not offer location scouting services.

On July 27, 2000, plaintiff Hamptons Locations, Inc. initiated an action in the Southampton Justice Court, Suffolk County, New York, against Richard, Darrell, and "Hampton Locations."  Plaintiff withdrew this action with prejudice on May 10, 2002.  In the interim, Plaintiffs filed the instant action on August 13, 2001.  Essentially, Plaintiffs allege that Defendants used the allegedly infringing domain name "www.hamptonlocations.com" for the

purpose of diverting web browsers to the Design Quest website which resulted in consumer confusion and a disruption to Plaintiffs' business. Defendants counter that there was never any business set up as "Hampton Locations" and that they never received any referrals in the few months www.hamptonlocations.com was linked to the Design Quest website except from Grigor for the photo shoot of June 13, 2000. (Richard Rubens Aff. ¶ 21.) In fact, shortly after Defendants learned of this dispute, they removed the link from the Design Quest website and let the registry of the domain name expire, which it did on July 8, 2001. Thereafter, on May 12, 2002, plaintiff Hamptons Locations purchased the www.hamptonlocations.com domain name and remains its owner today.

By Decision and Order dated December 17, 2002, the Court granted in part and denied in part Defendants' motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The causes of action which survived that motion are alleged violations of the Lanham Act and a claim for unfair competition.

By Memorandum of Decision and Order dated February 17, 2004, the Court denied Defendants' motion for summary judgment and granted Plaintiffs' motion to dismiss the counterclaims against them. Defendants, who were proceeding pro se at that time, later retained present counsel and requested permission to file another motion for summary judgment at the end of discovery. The Court granted Defendants' request. Presently before the Court is Defendants' second motion for summary judgment.

## DISCUSSION

### I.    *Standards for Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only

appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P.56(c))).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     The Instant Action is not Barred by Res Judicata

Citing no authority, Defendants argue that the instant action is barred under the doctrines of res judicata and collateral estoppel based upon Plaintiffs' withdrawal of the Southampton Justice court action with prejudice. This argument is rejected for the reasons indicated below.

### A.     The State Court Proceeding

On July 27, 2000, plaintiff Hamptons Locations, Inc. filed an action in the Southampton Justice Court against Richard, Darrell, and Hampton Locations, asserting claims for deceptive acts and practices in violation of New York State Business Law and "violation of state common law and/or trademark law." (Defs.' Mot. For Summary Judgment, Ex. F.) On May 10, 2002, and while the instant action was pending, the parties appeared on the record

before the state court judge and plaintiffs withdrew all of their claims with prejudice. (Defs.'

Reply, Ex. 6 at 24.) Thereafter, the state court entered an order stating in pertinent part: "On

May 10, 2002 the parties in the above entitled action appeared before this Court ready for trial

and it was stipulated that plaintiff, Hamptons Locations, Inc., by their attorney Michael Griffith

withdraw its entire complaint *with prejudice*." (Defs.' Mot. For Summary Judgment, Ex. I

(emphasis in original).)

During the May 10, 2002 proceeding, counsel for plaintiff Hamptons Locations,

Inc. indicated that with regard to its trademark claims:

> [W]e are presently in federal court represented by Patricia Weiss,
> local counsel, federal counsel, and we're assuming that the court
> has taken jurisdiction over the federal trademark and the state
> trademark claims. In the event that they don't, we reserve our
> right to come back here at a later time to address the state
> trademark claims. We assume – we assume that the federal court
> will handle, not only the federal claims, but also the state pendant
> claims.

(Defs.' Reply, Ex. 6 at 5.) He further stated that because of the pending federal case, plaintiff

was requesting that the state action be adjourned or stayed "pending jurisdiction being taken by

the federal court." (*Id.* at 6.) In that regard, he indicated that he "would have no objection to

withdrawing [the trademark claims], but federal counsel said to just adjourn it here." (*Id.* at 21.)

He further explained that federal counsel was informed by the Clerk of the Court in the Eastern

District of New York that the federal case file had been misplaced because his case had been

"bounced around to a couple of different judges,"[1] (*id.* at 7-8), so he was unsure whether the

---

[1] The instant action was initially assigned to Judge Leonard D. Wexler. On September
18, 2001, the case was reassigned to Judge Jacob Mishler and on November 2, 2001, the case
was reassigned to the undersigned.

federal court would exercise jurisdiction, (*id.* at 9).  Thus, he was "just keeping it pending in the event that the federal court doesn't pick it up, which I assume they will."  (*Id.* at 19-20.)  Later in the proceeding, however, when the judge noted that plaintiff had opposed defendants' request for an adjournment and was now itself requesting an adjournment, plaintiff's counsel indicated that he would dismiss the trademark claim as well:

> THE COURT: So you are withdrawing your action?
>
> [PLAINTIFFS' COUNSEL]: I withdraw my action.
>
> THE COURT: It's withdrawn.
>
> [DEFENDANT]: With prejudice, your Honor?
>
> [PLAINTIFFS' COUNSEL]: I am happy to withdraw it.  If there is a state trademark claim, I can always bring it in Supreme Court
>
> THE COURT: Very good.  The action is withdrawn.
>
> [DEFENDANT]: Your Honor, can you rule withdrawn with prejudice?
>
> THE COURT: Yes.

(*Id.* at 24.)

## B.      *The Preclusive Effect of the State Court Proceeding*

In opposing Defendants' motion, Plaintiff relies on the Second Circuit's decision in *Israel v. Carpenter*, 120 F.3d 361, 365 (2d Cir. 1997).  In that case, plaintiff Donald M. Israel ("Israel") sued Daniel E. Carpenter ("Carpenter") and three corporate defendants for breach of contract in Massachusetts state court in February 1993.  *Id.* at 363.  The next month, Carpenter caused a corporation wholly owned by him to sue plaintiff and two other corporate defendants, asserting, inter alia, federal trademark claims, in the Southern District of New York.  *Id.*  Israel

then filed a third-party complaint against Carpenter in the federal action alleging essentially the same breach of contract claims he had asserted in Massachusetts. *Id.*

On August 10, 1993, Israel filed a voluntary stipulation of dismissal in the Massachusetts action that dismissed his claims against Carpenter with prejudice and his claims against the three corporate defendants without prejudice. *Id.* Twenty months later, the federal action was concluded when the district court granted Israel's motion for summary judgment dismissing the trademark claims and declined to exercise pendent jurisdiction over Israel's state-law claims, thereby dismissing those claims without prejudice. *Id.*

The lawsuit underlying the appeal was filed in New York State Supreme Court on March 29, 1995, the day after the first federal action was dismissed. In this third action, Israel sued Carpenter and another corporate defendant, alleging the same breach of contract claims he had asserted against Carpenter twice before. *Id.* After Carpenter removed the case to federal court, he moved to dismiss Israel's claims arguing that they were barred by res judicata and collateral estoppel based upon the with-prejudice dismissal of those claims in the Massachusetts action. *Id.*

In reversing the district court's granting of summary judgment dismissing Israel's complaint, the Second Circuit began with a recitation of the general rule that "[o]rdinarily, a stipulation of dismissal 'with prejudice' as to a pending action is unambiguous; like any such dismissal, it is 'deemed a final adjudication on the merits for res judicata purposes on the claims asserted or which could have been asserted in the suit.'" *Id.* at 365 (quoting *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 105 F.3d 72, 78 (2d Cir. 1997)). Thus, "[s]uch a stipulation will (almost invariably) have preclusive effect notwithstanding a litigant's post hoc assertion that he

intended to preserve certain claims." *Id.*

Notwithstanding this rule, the court concluded that this "broad principle" did not apply to the facts of that case. Citing the well-settled rule that state law applies in determining the preclusive effect of a stipulation of dismissal filed in state court,[2] *id.* at 366, the court found that Massachusetts law "require[d] inquiry into the intended scope and effect of such a stipulation," *id.* at 366, and thus, the court should "direct its interpretation to the meaning of the terms of the writing or writings *in the light of the circumstances of the transaction*." *Id.* at 367 (emphasis in original) (citation and internal quotation marks omitted). The court then held that the circumstance of this case, i.e., "the litigation of two nearly identical lawsuits simultaneously in two jurisdictions, the stipulated dismissal of one of them with prejudice, and the continued litigation of the other," raised a material issue of fact as to the meaning of the stipulation of dismissal. *Id.*

Applying *Israel* to the present action, the Court must determine what effect New York courts would give the stipulation of dismissal filed by Plaintiffs in the Southampton Justice Court. The general rule in New York is that a stipulation of discontinuance with prejudice is afforded res judicata effect and will bar litigation of the discontinued causes of action. *See Dolitsky's Dry Cleaners, Inc. v. Y L Jericho Dry Cleaners, Inc.,* 610 N.Y.S.2d 302, 303 (2d Dep't 1994). "However, the language 'with prejudice' is narrowly interpreted when the interests of justice, or the particular equities involved, warrant such an approach." *Id.; see also Troy v. Goord*, 752 N.Y.S.2d 460, 461 (4th Dep't 2002) ("The order of dismissal in the federal action is

---

[2]  *See also Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) ("New York law [applies] in determining the preclusive effect of a New York State court judgment.").

entitled to res judicata effect where, as here, *the circumstances evince* that it is on the merits or with prejudice to relitigation of the discontinued claim, or where *the parties otherwise have indicated* that the settlement and discontinuance would have such preclusive effect.") (emphasis added); *Karniol v. Good Move Trucking, Inc.*, 722 N.Y.S.2d 143, 143 (1st Dep't 2001) ("Under these circumstances, where the inclusion of the words 'with prejudice' in the order discontinuing the prior action may well have been attributable to a unilateral mistake by plaintiffs' counsel and contrary to the previously reached understanding of the parties and the court as to the effect of the discontinuance, the motion court, pending the conduct of discovery respecting the understanding upon which the discontinuance had been agreed to, properly declined to accord the discontinuance res judicata effect."); *Singleton Mgmt., Inc. v. Compere*, 673 N.Y.S.2d 381, 384 n.1 (1st Dep't 1998) ("It may be noted that even where the use of such terms as 'with prejudice' or 'on the merits' raises a presumption that the stipulation is to be given res judicata effect in a subsequent action on the same cause of action . . . , a court may always consider evidence that the parties intended otherwise.").

Here, the circumstances under which plaintiff Hamptons Locations, Inc withdrew its state court action compel the conclusion that plaintiff's withdrawal was not intended to foreclose prosecution of its claims in this forum. To the contrary, the transcript of these proceedings clearly indicates that the only reason plaintiff agreed to withdraw its trademark claims in the state court action was because it intended to pursue these claims in this action, which was pending at the time plaintiff withdrew its state court case. Any other finding would work an injustice as it would clearly be contrary to the parties' intent. *See Vega v. State Univ. of N.Y. Bd. Of Trustees*, 67 F. Supp. 2d 324, 335 (S.D.N.Y. 1999) (finding that circumstances and

plain language of stipulation discontinuing state court action with prejudice indicated that parties did not intend such stipulation to preclude then-pending federal court action); *D'Angelo v. City of New York*, 929 F. Supp. 129, 135 (S.D.N.Y. 1996) ("In light of the fact that the Kings County action was untenable due to plaintiff's failure to file a timely notice of claim, the parties, fully aware that the § 1983 claims were being prosecuted in federal court, stipulated to the dismissal of the action 'with prejudice.' To hold that plaintiff's § 1983 claims are barred merely because the phrase 'with prejudice' is often equated with 'on the merits would frustrate the intent of the parties as well as the purpose of the rules of preclusion as defined under New York law."). Thus, the Court finds that plaintiff Hamptons Locations, Inc.'s withdrawal of the state court case with prejudice does not bar the present action and, accordingly, Defendants' motion for summary judgment on this ground is denied.[3]

### III.    *Plaintiffs' Anticybersquatting Claim*

Plaintiff's first cause of action alleges that Defendants violated section 1125(d) of the Lanham Act, also known as the Anticybersquatting Consumer Protection Act ("ACPA"). "Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." *Sporty's Farm L.L.C. v. Sportsman's Mkt, Inc.*, 202 F.3d 489, 493 (2d Cir. 2000). The ACPA was passed to

---

[3] Unlike the *Israel* case, the Defendants here did not litigate this case for "twenty months" before raising the defense of res judicata; rather, they raised it in their first motion to dismiss, filed on May 17, 2002, just one week after Plaintiff withdrew the state court action. Because Defendants had not sufficiently developed their argument, however, Defendants' motion was denied. (*See* Dec. 17, 2002 Decision and Order at 12.) Nonetheless, given that plaintiff's intent in withdrawing its state claims is clearly discernable from the state court transcript, summary judgment dismissing Plaintiffs' claims based on the stipulation would be inappropriate.

protect consumers from this conduct.  *Id.* at 495.

The elements of a claim brought under the ACPA are as follows: (1) Defendants registered, trafficked in or used a domain name; (2) that was identical or confusingly similar to Plaintiffs' mark; (3) Plaintiffs' mark, at the time Defendants registered their domain name, was distinctive; and (4) Defendants committed these acts with a bad faith intent to profit from Plaintiffs' mark.  *See* 15 U.S.C. § 1125(d)(1)(A).  Defendants argue that Plaintiffs cannot raise a triable issue of fact as to the first and fourth elements.  The Court will address Defendants' arguments in turn.

### A.    *Use of Domain Name*

Defendants contend that there is no proof that they "used" the domain name within the meaning of the statute and that  "DSNY," the apparent registrant of the domain name www.hamptonlocations.com, is an indispensable party to this action.  In response, Plaintiffs claim there is a question of fact as to "who was the de facto 'registrant' of" the domain name.

Section 1125 (d)(1)(A) provides that liability under the ACPA is limited to a person who "registers, traffics in, or uses a domain name."  15 U.S.C. § 1125 (d)(1)(A).  The conjunctive "or" clearly indicates that liability can arise from any one of the three listed activities.  *See Omega S.A. v. Omega Engineering, Inc.*, 228 F. Supp.2d 112, 138 (D. Conn. 2002).  However, Section 1125(d)(1)(D) expressly provides that a person may not be held liable for "using" a domain name unless that person "is the domain name registrant or that registrant's authorized licensee."  15 U.S.C. § 1125(d)(1)(D).  Section 1125(d)(1)(E) expressly provides that "the term 'traffics in' refers to transactions that include, but are not limited to, sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or

receipt in exchange for consideration." *Id.* § 1125(d)(1)(D). Thus, "traffics in" contemplates "a direct transfer or receipt of ownership interest in a domain name to or from the defendant." *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 645 (E.D. Mich. 2001). Finally, although the term "registers" as used in this section is not specifically defined, it has been interpreted to mean a person who presents a domain name for registration, as opposed to the actual registrar, i.e., the entity which grants and maintains the domain names. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 141 F. Supp. 2d 648, 655 (N.D. Tex. 2001).

Here, there is no evidence that Barbara and Richard engaged in transactions of any of these kind with regard to the disputed domain name at issue and, thus, there is no proof that they "register[ed], traffic[ked] in, or use[d]" the domain name. The only evidence before the Court is that Darrell and his friends developed the idea for this website and that "one of [Darrell's] friends purchased this name through DSNY," DSNY being the name listed as the domain registrant, with an address at 575 Madison Avenue, New York, NY 10022. (Darrell Aff. ¶ 8; *see also* Aff. of James Whang, dated Feb. 28, 2005; Defs.' Mot. For Summary Judgment, Ex. E.) Thus, there is no evidence that Barbara and Richard participated in the registration or purchase of the domain name or that either of them qualify as DSNY's "authorized licensee[s]." For these reasons, the Court is compelled to conclude that Plaintiffs' ACPA claim as against Barbara and Richard must fail.

The same cannot be said of Darrell, however. Although the evidence linking Darrell to DSNY is marginal at best, the Court cannot state as a matter of law that no reasonable trier of fact could conclude that Darrell was sufficiently linked to DSNY so as subject him to liability under the ACPA. He was clearly involved in the development, launching, and operation

of the website and he himself testified that he went to "Network Solutions" with his friends to see what domain names were available. (Darrell Aff. ¶ 7.) Thereafter, Darrell and his friends chose www.hamptonlocations.com and "one of [his] friends" purchased the domain name through DSNY. (*Id.* ¶ 8.) Although the Court is dismayed, to say the least, at Plaintiffs' failure to elicit evidence as to the identity of DSNY and Darrell's relationship therewith, based on the evidence the Court does have, the Court is constrained to conclude that a reasonable trier of fact could circumstantially infer that Darrell was DSNY's "authorized licensee." Accordingly, to the extent Defendants seek summary judgment as to Darrell on this ground, their motion is denied.

**B.      Bad Faith Intent to Profit From Mark**

Defendants argue that there is no evidence to show that any of the Defendants acted "with a bad faith intent to profit from Plaintiffs' mark." *See* 15 U.S.C. § 1125(d)(1)(A). The ACPA lists nine factors courts *may* consider in determining whether a person has acted in bad faith:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain

name in the bona fide offering of any goods or services, or the
person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false
contact information when applying for the registration of the
domain name, the person's intentional failure to maintain accurate
contact information, or the person's prior conduct indicating a
pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain
names which the person knows are identical or confusingly similar
to marks of others that are distinctive at the time of registration of
such domain names, or dilutive of famous marks of others that are
famous at the time of registration of such domain names, without
regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is
not distinctive and famous within the meaning of subsection (c)(1) of this section.

*Id.* § 1125(d)(1)(B)(I). The statute also provides that "[b]ad faith intent described under

subparagraph (A) shall not be found in any case in which the court determines that the person

believed and had reasonable grounds to believe that the use of the domain name was a fair use or

otherwise lawful. *Id.* § 1125(d)(1)(B)(ii).

Defendants offer evidence in the form of affidavits by Darrell and two of his

attorney-friends that the domain name www.hamptonlocation.com was registered with the intent

to offer summer rentals in the Hamptons at discounted prices. Because Darrell works full time

for a real estate company and his two friends are attorneys, they figured that with their combined

expertise, this might be a profitable venture. After some research, however, they determined that

the larger and more established real estate companies were already providing this service and

that it would not be economically profitable to pursue it. Darrell argues that this evidence

demonstrates that he acted in good faith. Although the Court agrees that this evidence is

probative of his intent, it certainly does not conclusively determine that he acted in good faith.

In fact, because Darrell never actually pursued the alleged real estate venture, a reasonable trier

of fact could infer that it was never his intent to do so.

In addition, Darrell further argues that the fact that he sent Grigor the e-mail in April 2000 alerting her to the allegedly infringing website conclusively demonstrates his lack of bad faith. The Court disagrees. Here, there is evidence, although it is hotly disputed, that Darrell refused to surrender the website to Plaintiffs without receiving payment for the transfer. Given that the ACPA was created to prevent the registration of a domain name of the mark of an established company by a person who later demands money in exchange for relinquishing that domain name, a reasonable trier of fact could infer that Darrell sent Grigor the e-mail precisely for that purpose, i.e., to alert her of its existence, so that he could later demand payment for the name.

Moreover, although Darrell claims that he was unaware of Plaintiffs at the time www.hamptonlocations.com was registered, a reasonable trier of fact could believe Grigor's claims that she met with Darrell's parents in early July 1999 and that at that time, they acknowledged receipt of her business cards. This information, coupled with the timing of the domain name registration which occurred on July 8, 1999, just days after Grigor allegedly met with Darrell's parents, could suggest that Darrell had knowledge of Plaintiffs' mark prior to the registration of www.hamptonlocations.com. Although prior knowledge of Plaintiffs' mark does not, standing alone, constitute bad faith, combined with other factors, Darrell's prior knowledge is probative to some degree. In that regard, several of the factors listed in the ACPA weigh in favor of a conclusion that Darrell had the requisite statutory bad faith. For example, it is clear that Darrell did not have any intellectual property rights in www.hamptonlocation.com at the time the domain name was registered; the domain name did not include Darrell's name or a name

-19-

that is otherwise commonly used to identify Darrell; Darrell never actually used the domain name for his real estate venture; the possibility that Darrell may have intended to divert consumers from Plaintiffs' website to his own and ultimately to the Design Quest site for commercial gain; and the lack of any evidence as to the identity of DSNY, the domain name registrant. Accordingly, the Court finds that looking at the totality of the circumstances, there is a genuine issue of material fact as to Darrell's intent as that term is defined by the ACPA. *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.,* 228 F.3d 56, 68 (2d Cir. 2000) ( "Because the issue goes to defendants' intent, it is best left in the hands of the trier of fact.") (internal quotation marks and citation omitted); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 583 (2d Cir. 1991) ("[i]ssues of good faith are generally ill-suited for disposition on summary judgment.").

In sum, Plaintiffs' anticybersquatting claim is dismissed as to Richard and Barbara and sustained as to Darrell.

## IV. *Plaintiffs' Unfair Competition Claims*

Count 5 of the Complaint charges Defendants with unfair competition. As noted in the Court's December 17, 2002 Decision and Order, such a claim may be based on state law, *see, e.g.*, *Telford Home Assistance, Inc. v. TPC Home Care Svcs., Inc.*, 621 N.Y.S.2d 636 (2d Dep't 1995), federal law, *see, e.g.*, *Champagne v. DiBlasi*, 134 F. Supp.2d 310, 314 (E.D.N.Y. 2001), *aff'd*, 36 Fed. Appx. 15 (2d Cir. 2002), or both.

A Lanham Act claim for unfair competition pursuant to 15 U.S.C. § 1125(a) does not require proof of a federally registered trademark. *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.,* 228 F.3d 56, 61 (2d Cir. 2000). Instead, such a claim

requires a plaintiff to show: (1) the false or misleading use of any word, name symbol or device in connection with goods or service; (2) in interstate commerce; (3) in a manner that is likely to cause confusion or deception as to, inter alia, affiliation.  15 U.S.C. § 1125(a)(1)(A); *see also Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995) (stating § 1125(a)(1)(A) "prohibits any misrepresentation likely to cause confusion as to the source or the manufacturer of a product); *Champagne*, 134 F. Supp. 2d at 314 (setting forth elements of unfair competition claim).  In order to sustain a common-law cause of action for unfair competition through the use of a trade name, Plaintiffs must establish that the Defendant's acts "'constituted an unfair appropriation or exploitation of any special quality attached to [P]laintiff[s'] name.'" *Telford Home Assistance*, 621 N.Y.S.2d at 636.

As an initial matter, the Court finds that based upon the present record, there is no evidence that Barbara or Richard were in any way involved in any use of the www.hamptonlocation.com site.  In that regard, there is no evidence that they participated in its purchase, its development or its operation.  Accordingly, Plaintiffs' claims of unfair competition are dismissed as to Richard and Barbara.

As to Darrell, the record demonstrates that he linked the www.hamptonlocation.com website to the Design Quest website so that a person opening up the former site would be re-directed to the latter.  Although Defendants argue that Plaintiffs have no evidence that any consumers were *actually* confused by the website or that as a result thereof, they were unable to locate Plaintiffs' website, there is no requirement in the statute that Plaintiff prove actual confusion.  Rather, the standard is whether Defendants' use of Plaintiffs' mark is "likely to cause confusion."  15 U.S.C. § 1125(a)(1)(A).  In that regard, a reasonable consumer

seeking to use Plaintiffs' services could have inadvertently typed in Darrell's domain name and after being re-directed to the Design Quest site, could have believed that the Rubens' Hamptons home was a location being offered by Plaintiffs. Thus, a reasonable consumer could have been confused as to the source of this location, *see Lipton*, 71 F.3d at 473, particularly in light of the fact that the sole purpose of Plaintiffs' business is to scout such locations.

In addition, to the extent Defendants argue that Plaintiffs' mark is not entitled to protection because it is weak or non-distinctive as allegedly demonstrated by the limited protection it received when it was finally approved by the United States Patent and Trademark Office for registration, the Court notes that the strength of the mark is just one factor used by Courts in determining the likelihood of confusion under the Lanham Act. *See Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (listing eight factors to be used in determining whether or not there is likelihood of confusion).[4] Moreover, the fact that Plaintiffs' mark was accepted for registration by the Trademark Office entitles Plaintiffs to a presumption that its registered mark is inherently distinctive. *See Sporty's Farm*, 202 F.3d at 497. Absent evidence or argument on any of the other *Polaroid* factors, and given the presumption of distinctiveness afforded to Plaintiffs' mark, Defendants' motion for summary judgment on this ground is denied.

Finally, Defendants have not established as a matter of law that they are entitled

---

[4] These factors are: "(1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) actual consumer confusion between the two marks; (6) the defendant's intent in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group." *Polaroid*, 287 F.2d at 495.

to the affirmative defense of "fair use."[5]  To come within the fair use defense, Darrell must have

made use of Plaintiffs' mark  "(1) other than as a mark, (2) in a descriptive sense, and (3) in good

faith."  *EMI Catalogue*, 228 F.3d at 64 (citing 11 U.S.C. § 1115(b)(4)).  "The fair use doctrine

permits use of a protected mark by others to describe certain aspects of the user's own goods."

*Id.*  The rationale behind the fair use doctrine centers on "the undesirability of allowing anyone

to obtain a complete monopoly on use of a descriptive term simply by grabbing it first."  *KP*

*Permanent Make-Up*, *Inc. v. Lasting Impression I, Inc.*, 125 S. Ct. 542, 550 (2004).

   Defendants contend that the purchase of www.hamptonlocations.com was a fair

use because it was merely descriptive of the real estate business that was being pursued.

However, Darrell never actually *used* the domain name for this purpose; therefore, he cannot

claim fair use based merely on an idea.

   Next, Defendants assert that insofar as the domain name was used to link internet

users to the Design Quest site, the domain name was merely descriptive of Darrell's parents'

home which, after all, is located in the Hamptons.  Citing no authority, Defendants further

contend that the website was used "other than as a mark" because it merely re-routed an internet

user to the Design Quest website.  Thus, Defendants argue, the website merely served as a web

address to "identify the user's location" and had no content of its own.  Absent any authority

adopting this theory, the Court declines to hold as a matter of law that the link set up by Darrell

did not constitute use "as a mark."  *See Venetianaire Corp. of Am. v. A & P Import Co.*, 429 F.2d

1079, 1081 (2d Cir. 1970) (fair use defense unavailable if the name is used as a trade or service

---

[5]  To the extent Plaintiffs argue that Defendants waived the affirmative defense of fair use
because it was not raised in their answer, the Court finds that given Defendants' pro se status at
the time, any failure on their behalf was excused.

mark.). Moreover, at the very least there is a question of fact as to whether Darrell's use was merely descriptive, in a generic sense, of the location of his parents' home or whether a trademark use was both effected and intended. This is especially true given that once linked to the Design Quest website, a consumer would see not just pictures of the house but an offer to rent the house for photo shoots, which is the primary focus of Plaintiffs' business.

In sum, Plaintiffs' claims of unfair competition are dismissed as to Barbara and Richard. However, because based on the papers submitted, Defendants have not convinced the Court that Darrell is entitled to judgment as a matter of law, the unfair competition claims are sustained as to Darrell.

## V.      *Plaintiffs' Claim for Injunctive Relief*

Count 2 of the Complaint seeks injunctive relief pursuant to the Lanham Act "to prevent a further violation of Plaintiffs' rights." (Compl. ¶ 31.) It is undisputed that Plaintiffs now own the domain name in controversy and have done so since May 12, 2002. Accordingly, Plaintiffs' claim for injunctive relief is dismissed as moot. *See Bihari v. Gross*, 119 F. Supp. 2d 309, 316 (S.D.N.Y. 2000) (finding no basis for injunctive relief where party voluntarily relinquished domain name).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to Richard and Barbara Rubens and **DENIED** as to Darrell Rubens. In addition, Count 2 of the Complaint, which seeks injunctive relief, is dismissed. The parties are directed to appear before the Court on November 4, 2005 at 3:00 p.m at Courtroom 930 for a final status

conference. At that time, the Court will schedule a date for trial.

**SO ORDERED.**

Dated: Central Islip, N.Y.
      September 30, 2005

/s_____
Denis R. Hurley, U.S.D.J.