UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
HAMPTONS LOCATIONS, INC. and NANCY
GRIGOR,

               Plaintiffs,

     -against-

RICHARD RUBENS, BARBARA RUBENS, and
DARRELL RUBENS, each individually and
doing business as HAMPTON LOCATIONS,

               Defendants.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
01-CV-5477 (DRH)(WDW)

**APPEARANCES:**

**PATRICIA WEISS, ESQ.**
Attorney for Plaintiffs
P.O. Box 751
Sag Harbor Shopping Cove
Main Street - Suite 12
Sag Harbor, New York 11963-0019

**MICHAEL B. RONEMUS, ESQ.**
Ronemus & Vilensky
Attorney for Defendants
112 Madison Avenue
New York, New York 10016

**HURLEY, District Judge**:

               Plaintiffs Hamptons Locations, Inc. and Nancy Grigor ("Grigor") (collectively,

"Plaintiffs") filed the present action against defendants Richard Rubens ("Richard"), Barbara

Rubens ("Barbara"), and Darrell Rubens ("Darrell") claiming damages arising out of defendants'

use of an allegedly infringing website.  On January 29, 2007, a jury returned a verdict for

$1,000.00 in favor of Plaintiffs against Darrell on Plaintiffs' first cause of action for a violation

of section 1125(d) of the Lanham Act, also known as the Anticybersquatting Consumer

Protection Act ("ACPA"), 15 U.S.C. § 1125(d).[1]  Presently before the Court is Darrell's motion to set aside the jury verdict pursuant to Federal Rule of Civil Procedure ("Rule") 50(b).  For the reasons stated below, Darrell's motion is denied.

### BACKGROUND

The background of this case is set forth in the Court's September 30, 2005 and May 25, 2006 Orders, familiarity with which is assumed.  Thus, the Court will only state the facts necessary for disposition of the instant motion.

In 1994, Grigor created Hamptons Locations, Inc., a New York corporation.  Hamptons Locations, Inc. uses the service mark and business name "Hamptons Locations" and the domain name "www.hamptonslocations.com."  Hamptons Locations provides and scouts locations for, inter alia, photo shoots, film and television commercials, videos, and corporate meetings.

Barbara and Richard are husband and wife.  Darrell is their son.  Barbara and Richard work for Design Quest, Ltd., an architectural and interior design firm located in New York City.  They own a home in the Hamptons which they designed and built in 1983 and use their home as an example of their architectural talents.  With the help of their son Darrell, they developed a website – www.dqny.com – to showcase their services.  This website displays pictures of their Hamptons home and offers the home as a rental for photo shoots.

On July 8, 1999, Darrell and his friends caused the registration of the domain name "HamptonLocations.com."  The only difference between this domain name and Plaintiffs'

---

[1]  All claims against Barbara were dismissed via summary judgment; Plaintiffs' claims against Richard were presented to the jury and Richard was found not liable on all counts.

business name, i.e., Hamptons Locations, was the absence of the letter "s" between the words "Hampton" and "Locations."  On April 18, 2000, Darrell  "linked" the www.hamptonlocations.com website with his parents' Design Quest website, www.dqny.com. In other words, if a person typed in www.hamptonlocations.com, a "link" would re-route that person to the Design Quest website.

Plaintiffs filed the instant action alleging that Richard, Barbara, and Darrell used the allegedly infringing domain name www.hamptonlocations.com for the purpose of diverting web browsers to the Design Quest website which resulted in consumer confusion and a disruption to Plaintiffs' business.  The only cause of action at issue here is Plaintiffs' anticybersquatting claim under section 1125(d) of the Lanham Act, for which Darrell was found liable to Plaintiff in the sum of $1,000.00.  For the reasons stated below, Darrell's Rule 50(b) motion for judgment notwithstanding the verdict as to this cause of action is denied.

## DISCUSSION

### I.      *Darrell's Rule 50(b) Motion is Procedurally Proper*

Before determining whether Darrell is entitled to judgment as a matter of law, the Court must first consider whether Darrell preserved his right to make a Rule 50(b) motion by making a sufficiently specific Rule 50(a) prior to the submission of the case to the jury.  For the reasons that follow, the Court finds that he has.

### A.      *Rule 50*

Rule 50 provides in relevant part:

(a) Judgment as a Matter of Law.

(1) In General. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have

a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

> (2) Motion. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. *The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.*

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(a) and 50(b) (emphasis added).

**B.**     ***Procedural Posture of Motion***

On Wednesday, January 24, 2007, at the conclusion of Plaintiffs' case-in-chief

(Tr.[2] at 1068), defendants Richard and Darrell (collectively "Defendants") moved for judgment

as a matter of law on numerous grounds which largely parallel those advanced in the current

motion. (*Id.* at 1076.) Specifically, Defendants argued that Plaintiffs had not proven: (1) "that

[Plaintiffs'] mark had acquired distinctiveness or secondary meaning as of June of 2000," (*id.* at

---

[2] Citations to "Tr." refer to the trial transcript filed in this case.

1078; *see also id.* at 1079); (2) that Darrell "registered or caused the registration" of the allegedly infringing domain name (*id.* at 1078); (3) that the allegedly infringing domain name was used in commerce; (4) "that the defendants' use of [the allegedly infringing domain name] was identical or confusingly similar to the plaintiff's mark" (*id.* at 1079); and (5) "any bad faith or intent to profit [on Defendants' behalf] from use of plaintiff's mark." (*Id.* at 1079-80.) The Court reserved decision on Defendants' motion (*id.* at 1081), but did rule that Plaintiffs' mark was not generic but rather was descriptive. (*Id.* at 1082.) Defendant did not present any case. (*Id.* at 1068.)

On Friday, January 26, 2007, the parties appeared before me for a charge conference, at the conclusion of which Defendants moved for judgment as a matter of law "at the end of the entire case. . . . based upon the same grounds [they] moved earlier." (*Id.* at 1135.) I reserved decision. (*Id.* at 1136.)

C.    *Plaintiffs' Arguments*

Plaintiffs argue that Defendants "did not do everything that was required under Rule 50(a)" because they did not specify the law, i.e. "statute, rule, law or case law precedent," upon which they were entitled to judgment. (Pls.' Mem. in Opp'n at 4.) Plaintiffs assert:

> Given the importance of a Rule 50(a) motion, it would have been important for Defendant Darrell Rubens to comply with the Rule by the mandated specificity. Instead, Defendants' counsel made an *ore tenus* motion very late on Wednesday afternoon, although [defense counsel] had already twice told the Court that Defendants would not be presenting a case . . . and the jury had been dismissed for the day. It would have likely been more sensible for Defendants to have requested that their Rule 50(a) motion be presented on Friday at 9:30 A.M. and there is no reason to assume that the Court would not have granted such a request . . . .

(*Id.* at 4-5 (internal citations omitted).)

        The Court finds Plaintiff's argument to be without merit. A post-trial motion for judgment as a matter of law under Rule 50(b) "is limited to those grounds that were specifically raised in [a] prior [Rule 50(a) motion]; the movant is not permitted to add new grounds after trial." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citations and internal quotation marks omitted). "Although Rule 50(a) does not define how specific the motion must be, the purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury." *Id.* (citations and internal quotation marks omitted). Therefore, "[t]he ultimate question is whether the [Rule 50(a)] motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in [their] proof." *Id.* at 287.

        That purpose was more than adequately served here. Defense counsel explained its position in detail following the presentation of Plaintiffs' case-in-chief. Defense counsel articulated several perceived inadequacies in Plaintiffs' proof and laid out his legal arguments. Moreover, the Court fails to see the legal significance in what time of day defense counsel made his motion under Rule 50. Accordingly, the Court finds that Darrell has not waived his right to assert his current Rule 50(b) motion.

**II.     *Darrell's Rule 50(b) Motion is Denied***

**A.     *Standard of Review***

As explained by the Second Circuit:

> The standard governing motions for judgment as a matter of law ("JMOL") pursuant to Rule 50, formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict is well established.  Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor.  In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence.  Thus, judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Galdieri-Ambrosini*, 136 F.3d at 289 (citations and internal quotation marks omitted).

In support of his Rule 50(b) motion seeking judgment as a matter of law on Plaintiffs' first cause of action, viz. their anticybersquatting claim under the ACPA, Darrell presents several arguments.  The Court briefly discusses the ACPA and then turns to the merits of each of Darrell's arguments.

**B.     *The ACPA***

Plaintiffs' first cause of action alleges that Defendants violated section 1125(d) of the Lanham Act, also known as the ACPA.  "Cybersquatting involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners."  *Sporty's Farm L.L.C. v. Sportsman's Mkt, Inc.*, 202 F.3d 489, 493 (2d

Cir. 2000). The ACPA was passed, inter alia, to protect consumers from this conduct. *Id.* at 495. More specifically, the ACPA "was passed 'to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks . . . .'" *Id.* (quoting S. Rep. No. 106-140, at 4 (1999)).

The elements of a claim brought under the ACPA are as follows: (1) Defendants registered, trafficked in or used a domain name; (2) that was identical or confusingly similar to Plaintiffs' mark; (3) Plaintiffs' mark, at the time Defendants registered their domain name, was distinctive; and (4) Defendants committed these acts with a bad faith intent to profit from Plaintiffs' mark. *See* 15 U.S.C. § 1125(d)(1)(A). Darrell contends that there was no evidence to support the first, third, and fourth elements. Darrell also maintains that there was no evidence that he used his domain name in commerce. The Court will address Darrell's arguments in turn.

1. ***There was Sufficient Evidence from which the Jury Could Infer that Darrell was the Registered Owner or Authorized Agent of the Domain Name www.hamptonlocations.com***

Section 1125(d)(1)(A) provides that liability under the ACPA is limited to a person who "registers, traffics in, or uses a domain name." 15 U.S.C. § 1125 (d)(1)(A). Here, the jury was charged that Darrell could be found liable for violating the ACPA if Plaintiffs established that Darrell "used" the domain name after November 29, 1999, the effective date of the statute.[3]

_____

[3] The conjunctive "or" used in § 1125 (d)(1)(A) clearly indicates that liability can arise from any one of the three listed activities, viz. registration, trafficking or use. *See Omega S.A. v. Omega Eng'g, Inc.*, 228 F. Supp. 2d 112, 138 (D. Conn. 2002). However, by Memorandum of

Section 1125(d)(1)(D) expressly provides that a person may not be held liable for "using" a domain name unless that person "is the domain name registrant or that registrant's authorized licensee." *Id.* § 1125(d)(1)(D). The jury was charged that the registrant for www.hamptonlocations.com was DSNY, with the address of 575 Madison Avenue, New York, New York. Accordingly, the jury was charged that Darrell could not be found to have violated the ACPA unless Plaintiffs had proven that Darrell "was an authorized licensee of DSNY, i.e. a person authorized by [DSNY] to perform a particular act or series of acts." (Tr. at 1268-69.)

Darrell argues that "[t]here was no evidence presented by Plaintiffs that proved that Darrell Rubens was the authorized agent of the registrant DSNY." (Defs.' Mem. at 10.) In making this argument, Darrell places great reliance on Grigor's "admi[ssion] at trial" that she did not know who obtained the domain name (*id.* (citing Tr. at 510)), and Grigor's husband's testimony that he believed that Darrell was not the owner of the website (Defs.' Reply at 9 (citing Tr. at 1015)).

Notwithstanding the testimony by Grigor and her husband as to their own personal beliefs regarding the domain name, there was ample testimony by Darrell himself upon which the jury could have relied to find that Darrell was the authorized licensee of DSNY. When asked what he knew about the registration of the domain name www.hamptonlocations.com, Darrell testified that he did not purchase the name but was "part of the discussion" regarding the creation of the site (Tr. at 556); that one year prior to its purchase, he and his friends discussed different business ventures and the "possibility of starting a long-

_____

Decision and Order dated September 30, 2005, the Court found that Plaintiffs had presented no evidence that Darrell trafficked in or registered the domain name; thus the only issue presented to the jury was whether Darrell "used" the domain name.

-9-

term summer rental Web site on the internet" (*id.*); these discussions were had with a "a couple

of friends" and "all of [their] girlfriends at that time were there . . . helping [them] out with some

of the stuff" (*id.* at 557); after "a couple of meetings to try to figure out how [they] were going to

do this business" they decided they "needed some kind of descriptive name to describe the

houses that [they would] be renting" and came up with hamptonlocations.com (*id.* at 558); "one

of [their] girlfriends at that time was given the task to purchase the domain name that [they]

agreed upon" although he did not know which girlfriend (*id.* at 559); the only way to register

domain names through Network Solutions was to "fill out a corporate name, as well as a mailing

address and location" (*id.*); they decided not to set up a corporation "because [they] didn't know

if this idea would take off" and sometime during their conversations, Darrell "mentioned [he]

knew [his] dad had an old corporation that he wasn't using" that "went under the acronym

DSNY, Decorator Services New York" (*id.* at 559-60); the address 575 Madison Avenue was

selected because it was his parents' address and they "figured if it was DSNY, why not put all

the information down so if anyone wants to contact [them] they know where to get in touch with

[them];" (*id.* at 560-61); and he did not recall there being a written agreement between him and

his friends (*id.* at 563).

Based on Darrell's testimony, the Court finds that a reasonable trier of fact could

circumstantially infer that Darrell was DSNY's "authorized licensee" in that he was a person

authorized by DSNY "to perform a particular act." Darrell was clearly involved in the

development, launching, and operation of the website. In fact, Darrell was the one who

suggested the name DSNY as the registrant and chose to list his parents' address as the

registrant's address. On this record, the Court cannot state as a matter of law that no reasonable

trier of fact could conclude that Darrell was sufficiently linked to DSNY so as subject him to liability under the ACPA as DSNY's authorized licensee. Accordingly, to the extent Darrell seeks judgment notwithstanding the verdict on this ground, his motion is denied.

> **2.** **_There was Sufficient Evidence from which the Jury Could Infer that Plaintiffs' Mark Achieved Secondary Meaning as of July 8, 1999_**

As noted above, one of the elements Plaintiffs had to prove on their ACPA claim is that Plaintiffs' mark, at the time DSNY registered the allegedly infringing domain name, was distinctive. In this regard, the jury was instructed that "Hamptons Locations" was a descriptive mark and thus was "protectable only if, as Plaintiffs maintain, the term ha[d] acquired distinctiveness in the marketplace as a source indicator for Plaintiffs' services, that is, if it ha[d] acquired 'secondary meaning.'" (Tr. at 1255; *see also id.* at 1082 (Court rules that mark is descriptive).)[4]

The jury charge provided as follows:

> By the term "secondary meaning," the law means that a term that is not inherently distinctive has been so used that its primary significance in the minds of the consuming public is not the service itself, but instead the identification of it with a single source.

---

[4] The validity of a mark, to a certain extent, depends upon its position along the so-called spectrum of distinctiveness. Courts classify a mark in one of four categories in ascending order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary. *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384-85 (2d Cir. 2005); *see also Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 131 (2d Cir. 2004). "A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put." *Lane Capital Mgm't, Inc. v. Lane Capital Mgm't, Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). Descriptive marks are not inherently distinctive, but are protectable when they acquire "secondary meaning," *Star Indus.*, 412 F.2d at 385, i.e., they identify the source of the product rather than the product itself, *ITC Ltd. v. Punchgini, Inc.*, 518 F.3d 159, 161 (2d Cir. 2008).

This does not mean that the consuming public must know the exact identity of that single source in the sense that it knows the name of the individual or entity providing the service. All that is necessary to establish secondary meaning is that the ordinary consumer associates the term with a single source, regardless of whether the consumer knows who or what that source is.

You must find, therefore, from a preponderance of the evidence, that a significant number of the consuming public for such services in the market area involved associates Hamptons Locations with a single source. It is for you to decide how many constitute a significant number, keeping [in] mind that the plaintiff need not prove that all or even a majority of the consuming public understands this secondary meaning.

Plaintiffs have [the] burden of proving secondary meaning. The mere fact that the plaintiffs are using Hamptons Locations, or that Plaintiffs began to use it before the defendants used Hampton Location[s], does not establish secondary meaning, nor is mere popularity of the service sufficient to show secondary meaning.

In determining whether "Hamptons Locations" has acquired secondary meaning, it is appropriate for you to consider any evidence relating to A, the length and manner of its use; B, the nature and extent of advertising and promotion; C, sales volume; D, unsolicited media coverage of the service; E, consumer studies linking the mark to a source; F, attempts to plagiarize the mark; and G, other efforts made by plaintiffs to promote the connection between Hamptons Locations and plaintiffs.

The above listing is not meant to be exhaustive nor is any one factor dispositive. Instead you should consider the above factors and any others you deem to be appropriate and then, given the totality of the circumstances as you find them to be, determine whether the plaintiffs have proved th[is] . . . element . . . .

(*Id.* at 1240-41.) *See also Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.* 65 F.3d 1063, 1070-71 (2d Cir. 1995).[5]

---

[5] Although Plaintiffs' mark was accepted by the United States Patent and Trademark Office for registration, which creates a presumption that the mark is valid, *see Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 114 (2d Cir. 2001), the Court ruled that the presumption did not

Citing *20th Century Wear, Inc. v. Sanmark Stardust Inc.*, 747 F.2d 81, 90 (2d Cir. 1984) for the proposition that "'proof of secondary meaning entails vigorous evidentiary requirements,'"[6] Darrell argues that Plaintiffs did not satisfy their "heavy" burden of establishing that Hamptons Locations had acquired secondary meaning as of July 8, 1999, the date DSNY registered the domain name www.hamptonlocations.com. In response, Plaintiffs point to four newspaper articles that were admitted into evidence. Plaintiff's Exhibit 69 is an article from The East Hampton Star, dated April 3, 1997, entitled "The Star Talks to Nancy Grigor, Moving Behind the Camera." This article states, inter alia:

> If a photo or film crew is working on location in East Hampton, chances are they've talked to Nancy Grigor. Mrs. Grigor, an Amagansett resident and former Ford Agency model, runs Hamptons Locations – a matchmaking service that connects filmmakers, advertisers, catalogue producers, and even engaged couples with locations that suit their needs.

(Pl.'s Ex. 69.) It goes on to discuss how Grigor came up with the idea for her business and they type of projects she takes on. (*Id.*) At trial, Grigor testified that the article was unsolicited (Tr. at 220), and that "when an article like this goes in the paper, I get calls from a lot of homeowners, people want to list their homes and do photo shoots. And I get tons of e-mails and letters and calls from people that read the articles. . . ." (*Id.* at 221.)

Plaintiff's Exhibit 74 contains a blurb from Cindy Adams's column in the New York Post, dated April 14, 1994, which states:

---

apply in this case because the registration did not occur until after the events in question. (Tr. at 1083.)

   [6] *20th Century Wear Inc.*, 747 F.2d at 90 (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F. Supp. 129, 134 (S.D.N.Y. 1972)).

> Need water?  From exotic to traditional, to ocean, bays, marinas,
> pools, sailboats, yachts, Ford model Nancy Grigor and
> screenwriter Wendy Becker knows the spot for your film, ad,
> commercial.  The new biz is called Hamptons Location.

(Pl.'s Ex. 74.)

Plaintiffs' Exhibit 79 is an article published in Dan's Papers, dated July 22, 1994,

entitled "How to find the Perfect Location From Insiders in the Know."  This article does not

mention the business name Hamptons Locations but does discuss Grigor: "Working with

photographers, magazine editors and having appeared in over 200 commercials, she knows the

importance of the perfect setting."  (Pl.'s Ex. 78.)  The article provides a phone number where

Grigor can be reached.  (*Id.*)

In further support of her claim that Hamptons Locations had acquired secondary

meaning, Plaintiffs rely on the testimony of Grigor and her husband.  Grigor testified that she

created Hamptons Locations in 1994.  (*Id.* at 86.)  Prior to 1999 she "did do a lot of catalogs"

including Lands End, The Company Store, and Chadwicks of Boston.  (Tr. at 92.)   She

advertised in "industry books" which she defined as "reference books [people go to ] if [they]

need a photographer, a producer, locations. . . . the types of books that people in the industry go

to to fill in the production of a shoot . . . ."  (*Id.* at 94.)  She identified several of the industry

books she advertised in.  (*Id.*)  She stated that "there were many articles in Newsday, The Daily

News, The Post, Dan's Paper, [and] the East Hampton Star" about Hamptons Locations.  (*Id.* at

95.)

Grigor's husband testified that Grigor was a "very well-known figure in the

community" (*id.* at 975), and that when people greeted her, they discussed Hamptons Locations

"[a]ll the time" both prior to February 2000 as well as after.  (*Id.* at 976.)

-14-

Finally, Plaintiffs point to a declaration signed by Grigor dated March 7, 2001 which was submitted to the United States Patent and Trademark Office as proof of her sales. (*See* Pl.'s Ex. 4.)  In her declaration, Grigor lists sales of $6,200.00 for 1994; $32,320.00 for 1995; $43,176.00 for 1996; $126,622.00 for 1997; $332,831.00 for 1998 and $294,531.00 for 1999.  (*See id.*)  At trial, when asked what the total amount of money her company made in 1999, she responded $129,246.30, which was significantly lower than the $294,531.00 listed in her declaration.  (Tr. at 488-89.)  Grigor tried to explain the discrepancy by stating that the lower figure came from her notes which stated "tax income" at the top (*id.* at 488), and she was uncertain as to whether this figure represented her "total[]" income or her income "after deductions."  (*Id.* at 491.)

Drawing all reasonable inferences in Plaintiffs' favor, the Court finds that a reasonable juror could have concluded that Plaintiffs' mark had secondary meaning and was thus distinctive.  Considering the evidence regarding the length of the mark's use prior to DSNY's registration (approximately 5 years), the nature and extent of Grigor's advertising, the company's sales volume,[7] the unsolicited media coverage of the mark, and that people in the community associated Grigor with Hamptons Locations, the Court cannot conclude that the jury's verdict "could only have been the result of sheer surmise and conjecture." *Galdieri-Ambrosini*, 136 F.3d at 289 (citations and internal quotation marks omitted).  Although Darrell points to

---

[7] Although Darrell maintains that Plaintiffs' sales figures should be given no weight due to Grigor's conflicting testimony regarding her 1999 sales, the case law is clear that such credibility determinations are for the jury.  *See, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

evidence that supports his position, such as use by competitors of the terms in Plaintiffs' mark

thereby decreasing the likelihood that people associated Hamptons Locations with a single

source, this evidence was not so "overwhelming . . . that reasonable and fair minded [persons]

could not arrive at a verdict against [it]." *Id.* (citations and internal quotation marks omitted).

Accordingly, Darrell's Rule 50(b) motion is denied as to this ground.

> **3.        There was Sufficient Evidence From Which the
> Jury Could Infer that Darrell Acted in Bad Faith**

Darrell argues that there was no evidence to show that he acted "with a bad faith

intent to profit from Plaintiffs' mark." *See* 15 U.S.C. § 1125(d)(1)(A).  For the reasons stated

below, the Court disagrees.

> **a.        The ACPA**

The ACPA lists nine factors courts *may* consider in determining whether a person

has acted in bad faith:

> (I) the trademark or other intellectual property rights of the person,
> if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name
> of the person or a name that is otherwise commonly used to
> identify that person;
> (III) the person's prior use, if any, of the domain name in
> connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark
> in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's
> online location to a site accessible under the domain name that
> could harm the goodwill represented by the mark, either for
> commercial gain or with the intent to tarnish or disparage the
> mark, by creating a likelihood of confusion as to the source,
> sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the
> domain name to the mark owner or any third party for financial
> gain without having used, or having an intent to use, the domain
> name in the bona fide offering of any goods or services, or the

-16-

person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false
contact information when applying for the registration of the
domain name, the person's intentional failure to maintain accurate
contact information, or the person's prior conduct indicating a
pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain
names which the person knows are identical or confusingly similar
to marks of others that are distinctive at the time of registration of
such domain names, or dilutive of famous marks of others that are
famous at the time of registration of such domain names, without
regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name
registration is or is not distinctive and famous within the meaning of subsection
(c)(1) of this section.

*Id.* § 1125(d)(1)(B)(I).  The statute also provides that "[b]ad faith intent described under

subparagraph (A) shall not be found in any case in which the court determines that the person

believed and had reasonable grounds to believe that the use of the domain name was a fair use or

otherwise lawful.  *Id.* § 1125(d)(1)(B)(ii).  The jury was instructed as to the nine factors and to §

1125(d)(1)(B)(ii).  (Tr. at 1247-48.)

**b.**      ***Record Evidence***

Viewed in the light most favorable to Plaintiffs, the evidence at trial disclosed the

following facts.  Grigor visited the Rubens' Southhampton residence in the winter of 1998 and

taped her business card[8] to their door with a note indicating that she was interested in doing a

photo shoot at their house.  (*Id.* at 100-01.)  She did not hear from the Rubens so she went back

to their home in 1999 and left another card and note.  (*Id.* at 101.)  She also taped a business card

on their neighbor's house.  (*Id.*)  Thereafter, over the July 4th weekend in 1999, she returned to

---

[8]  Grigor testified that her business card has the name Hamptons Locations on it with her
contact information.  (Tr. at 114.)

the Rubens' home with a girlfriend and met the Rubens.  (*Id.* at 104-5, 242-44.)  She told the

Rubens she would love to list their home with her company, the Rubens gave her a tour of their

house, and Grigor took photographs of the entire house and created a portfolio of the house.  (*Id.*

at 107; *see also* Pl.'s Ex. 18 (portfolio of Rubens' home).)

           In 1998, Darrell and his friends came up with the idea of offering summer rentals

in the Hamptons at discounted prices over the internet.  (Tr. at 556-57.)  They came up with the

domain name www.hamptonlocations.com, which name was registered by DSNY on July 8,

1999.  (*Id.* at 557-58.)  At some point, Darrell and his friends decided that the rental business

would not be "worthwhile" and they abandoned the idea.  (*Id.* at 570.)  Thereafter, after deciding

that the domain name was a good way to describe his parents' Hamptons home, in April 2000,

Darrell "linked" the www.hamptonlocations.com website with his parents' Design Quest

website, www.dqny.com.  In other words, if a person typed in www.hamptonlocations.com, a

"link" would re-route that person to the Design Quest website.  (*Id.* at 570-72.)  Darrell had

created the Design Quest website in 1997 to "showcase . . . [his parents'] interior designing skills

and their business of interior designers."  (*Id.* at 571.)

           After creating the link, Darrell researched location scouting companies on the

internet.  (*Id.* at 573.)  He sent e-mails to some of these companies, including one to Plaintiffs,

offering his parents' home for location shoots.  (*Id.*; Pl.'s Ex. 20)  These e-mails directed the

location companies, through the link of www.hamptonlocations.com, to the website of Design

Quest.  His e-mail to Plaintiffs stated as follows: "we rent our house out for photo, film and

commercial shoots.  How can we list with you?  Please look at our house at

www.hamptonlocations.com."  (Pl.'s Ex. 20.)  Darrell testified that he did not look at Plaintiffs'

-18-

domain name when he sent the e-mail. (Tr. at 573-74.)

On June 25, 2000, Plaintiffs' then counsel wrote a letter to Darrel demanding that he "cease and desist from the use of the domain name www.HamptonLocations.com" and that he "arrange for the transfer of its ownership to" Plaintiffs. (Ex. 30.) By letter dated June 27, 2000, Darrell responded, inter alia, that he was not the owner of the domain name and that the domain name did not infringe upon Plaintiffs' mark as it merely contained a portfolio of the Hamptons house and did not offer location scouting services. (Pl.s' Ex. 31.)

c. *The Record Evidence Supports the Jury's Finding of Bad Faith*

Although Darrell claims that he was unaware of Plaintiffs at the time www.hamptonlocations.com was registered in July 1999 by DSNY, the jury could have disbelieved him and inferred his prior knowledge based on the fact that his parents met with Grigor about her business just days before DSNY registered the offending domain name, suggesting that one or both of Darrell's parents communicated Plaintiffs' domain name to Darrell.[9] At the very least, the jury could have inferred that Darrell knew of Plaintiffs' domain name in April 2000 when he sent Grigor the e-mail. Although prior knowledge of Plaintiffs' mark does not, standing alone, constitute bad faith, when combined with other factors which find support in the record, the jury's finding is reasonable. For example, Darrell did not have any intellectual property rights in www.hamptonlocations.com at the time the domain name was registered; the domain name did not include Darrell's name or a name that is otherwise commonly used to identify Darrell; Darrell never actually used the domain name for his real

_____

[9] In addition, Grigor testified that she affixed her business card to Darrell's parents' home both in 1998 and in 1999.

-19-

estate venture thereby raising the inference that it was never his intent to do so; the possibility that Darrell may have intended to divert consumers from Plaintiffs' website to his own and ultimately to the Design Quest site for commercial gain; and the fact that Darrell initially refused to surrender the website. Accordingly, the Court finds that there was sufficient evidence from which the jury could infer that Darrell acted in bad faith in connection with the use of the allegedly infringing domain name.

### 4. *Whether Darrell Used the Allegedly Infringing Domain Name in Commerce*

Darrell's final argument is that Plaintiffs did not prove that Darrell used the allegedly infringing domain name in commerce as Darrell did not advertise the site and there was "mere token use." (Defs.' Mem. at 16.) In response, Plaintiffs argue that the ACPA "presupposes that use in connection with the internet is sufficient to constitute 'use in commerce.'" (Pls.' Opp'n at 20.)

At the charge conference, Defendants requested that the Court charge the jury that in order to prove their anticybersquatting claim under § 1125(d), Plaintiffs had to establish that Defendants used their domain name, www.hamptonlocations.com, in commerce. Although the Court charged that "use in commerce" was an element of Plaintiffs' service mark infringement claim under § 1125(a), the Court declined to charge this element with regard to Plaintiffs' ACPA claim under § 1125(d). (Tr. at 1145-53, 1267-71; *see also id.* at 1151 (noting that "the very nature of the internet . . . necessarily implicates interstate commerce").) Unlike § 1125(a), which specifically incorporates the requirement that an alleged infringer use the mark in commerce, *see* 15 U.S.C. §1125(a)(1), subsection (d) only requires that a plaintiff prove, inter alia, that a defendant "use[d]" the mark with a bad faith intent to proffer. *Id.* § 1125(d)(1)(A).

Accordingly, the Court did not charge that Plaintiffs had to prove Darrell's "use in commerce" with regard to Plaintiffs' ACPA claim under § 1125(d).

Although Darrell does not explicitly argue that the "use in commerce" element applies to claims under § 1125(d), and thus presents no authority in support of such a proposition, his assertion that Plaintiffs did not prove that Darrell used the allegedly infringing domain name in commerce presupposes that there is such a requirement. The Court has not found any case law in the Second Circuit which addresses this specific question under the ACPA. However, a review of the case law from other jurisdictions indicates that the prevailing view is that the ACPA does not require a plaintiff to demonstrate defendant's use in commerce. *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) ("The district court erred in applying the commercial use requirement to [plaintiff's] ACPA claim. Rather, the court should confine its inquiry to the elements of the ACPA claim listed in the statute, particularly to whether [defendant] had a bad faith intent to profit from his use of [plaintiff's] mark in his site's domain name."); *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004) ("Although there is some dispute between the parties as to whether the ACPA covers non-commercial activity, we see no reason to consider these arguments, as the statute directs a reviewing court to consider only a defendant's 'bad faith intent to profit' from the use of a mark held by another party."). Moreover, a recent decision by the Second Circuit questions whether the definition of "use in commerce" found in § 1127[10] and upon which Darrell essentially relies even applies to alleged infringers under the Lanham Act. *See Rescuecom Corp. v. Google Inc.*,

---

[10] Section 1127 defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.

562 F.3d 123 (2d Cir. 2009).[11]  Accordingly, the Court finds that it did not err in declining

Defendants' request to charge the jury that "use in commerce" was a required element of

Plaintiffs' § 1125(d) claim.

## CONCLUSION

For the foregoing reasons, Darrell's motion to set aside the jury verdict pursuant

to Rule 50(b) is DENIED.  The parties' motions for attorneys' fees and costs are respectfully

referred to Magistrate Judge Wall.

**SO ORDERED.**

Dated: Central Islip, N.Y.
         June 4, 2009

/s_____
Denis R. Hurley, U.S.D.J.

---

[11]  In *Rescuecom*, the Second Circuit took the unusual step of attaching an "appendix" to its decision to analyze the meaning of the term "use in commerce" under the Lanham Act. Although the court characterized the appendix as dictum, it did state that the definition of "use in commerce" found in § 1127 should only apply to those portions of the act prescribing eligibility for registration, and not the sections defining infringing conduct.  562 F.3d at 132-39.